PHILLEY *v.* PHILLEY.

DIVORCE—EXTREME CRUELTY—INTENTION — POSSIBILITY OF RECON-
CILIATION.

> In proceedings for a divorce by a husband on the ground
> of extreme cruelty, where the record sustains the finding
> of the court below that the acts of misconduct on the
> part of the wife were largely due to her run down physical
> condition and her highly nervous temperament, and that
> she had no intention of being cruel to plaintiff, and in
> view of the facts that in the meantime she has had
> treatment in a hospital with beneficial effect, and that
> her viewpoint has changed, the decree of the court below,
> who had the advantage of seeing and hearing the wit-
> nesses and of obtaining an impression as to whether the
> breach might not possibly be healed, dismissing the bill,
> will be affirmed.

Appeal from Allegan; Cross, J. Submitted October
15, 1919. (Docket No. 54.) Decided December 22,
1919.

Bill by Frank M. Philley against Lunella Philley
for a divorce. From a decree dismissing the bill,
plaintiff appeals. Affirmed.

*Clare E. Hoffman,* for plaintiff.
*Wilkes & Stone,* for defendant.

KUHN, J. This is an action for divorce. The plain-
tiff, 38 years of age, was married to the defendant,
33 years of age, on the 4th of August, 1914. They
have two children: Marion, born December 3, 1916,
and Eldon, born August 28, 1918. At the time of
their marriage, the plaintiff, his mother, and two sis-
ters were living upon the old homestead—a farm of
100 acres, near the city of Allegan. This farm had

On relations between one spouse and relatives of other as
affecting the question of desertion or cruelty, see notes in 13
L. R. A. (N. S.) 222, 34 L. R. A. (N. S.) 758, and L. R. A.
1915E, 161.

been devised by the father to the plaintiff, subject to the life estate of the mother, charged with the payment of a legacy of $2,000 to the sisters within three years after the mother's death.

On the day of their marriage, the mother and the sisters moved their household goods from the farm to Allegan, where they took up their residence, and the son took the farm, paying a rental therefor to the mother. The plaintiff and his wife lived together until the 25th of November, 1918, when the plaintiff filed this bill for divorce, charging the defendant with extreme cruelty, setting forth as specific grounds of cruelty the fact that his wife had a violent temper and refused to permit him to hold social intercourse with his relatives; threatened to leave him, her home and their children, saying that she would never return; that she repeatedly threatened to kill herself; that she assaulted him on two occasions; that she threatened to kill the plaintiff and the children; accused him of not being loyal to her and indulged in fits of sulking and anger to such an extent that it became impossible for him to longer live with her as his wife. Some of these allegations are denied by the defendant.

After hearing the proof, the trial judge dismissed the plaintiff's bill and made the following finding:

"The proofs fail to sustain the allegations of the bill of complaint. The acts of which the plaintiff complains are the result of a nervous condition of the defendant and not of any intention of being cruel to the plaintiff."

A lengthy review of the testimony in this record will serve no good purpose. The record cannot be read without gaining the impression that, in view of the fact that the little children—whose interest should be carefully considered—are vitally concerned, it is exceedingly unfortunate that another effort was not

made to effect a reconciliation.   The disposition of
the wife with reference to this is well shown by her
testimony, a portion of which is quoted below:

"When I went to Ann Arbor, I must have weighed
about 75 or 78 pounds; they told me I gained all of
15 pounds while there.   When I left, I weighed 94¾
and mentally, things have changed a great deal.   My
mental attitude is changed entirely.   There isn't the
hopelessness about it because I realize that one had
got to submit to circumstances, just accept whatever
comes now and then, be contented with the little or
much one can do with your own physical strength.
I was putting too much nervous tension into my work,
but I know now there is such a thing as relaxation
that I didn't know then.   Since my nerves and I got
rested, I have not had any inclination to take my life;
and I think Frank and I could work things out alone;
that we could work things out very harmoniously, and
I do realize that I have been at fault and that I can
forgive.   It would be easy to feel bitter about many
things but I can forgive everything.   I certainly cared
for Frank, have the same tender, wifely regard and
affection for him that I had when I married him, with
more understanding, and the children are everything
to me.   I have suggested to Frank at various times
relative to leaving the farm and trying it where it
wasn't two babies and 100 acres and a lumbago back
and hay fever in August and malaria fever at the hos-
pital and several other things that have been described,
and it would be the joy of my life to try it out under
those conditions.   It would be the joy of my life if
Frank could take the same attitude that I do and I
think we owe it to our children and to each other.   In
my honest judgment, Frank can't take the work him-
self and the burden that is connected with that 100-
acre farm; it has been an awful load for Frank as
well as me.   I would like to forgive and forget and
start fresh and I think Frank cares for me.   I can't
tell but I know he is naturally so tender and so good
and so true to me that I don't believe—and naturally
so not harboring any grudges nor anything like that
when he is his best self, he is so fair and so true and

so kind in every way that I have felt it more and more, gradually.

"*Q.* Whether or not you did notice marked changes in his feeling or his actions toward you after he had been together for a week and as against where he would be down with his people?

"*A.* Why, there always has been, perhaps it was partly my attitude, but I know it's made a great difference, that there would be a coldness and a lack of sympathy with my viewpoint of things only after it had been discussed. There is a close family union between Frank and his mother and sisters and I would not injure that in any way.

"*Q.* Whether or not you felt you were ever taken into the inner circle of that holy of holies?

"*A.* I think possibly I was as much to blame for not being taken in closer because of many things, perhaps my oversensitiveness; I know I was oversensitive.

"*Q.* Now that you have got your nerves together, would you be oversensitive?

"*A.* Of course there is a natural tendency there; I know I would fight it a great deal harder than I ever have."

It can be gleaned from this statement on the part of the defendant that many of the acts of conjugal unkindness of which she was guilty while living with her husband, during the time she was bearing his children, owing to the strain of the hard work which she endured, are now acknowledged by her to be things which she ought not to have done. Her interference with his effort to keep on friendly relations with his mother and her threats to take her own life and those of her children are subject to extreme criticism and can only be excused by the fact that her physical condition rendered her not responsible for such acts.

The marriage relation is not to be lightly entered upon and its great responsibilities are not to be easily thrown aside. That this plaintiff has suffered greatly is a fact of which the record is convincing, but a careful study of the case still leaves the conviction that

the trial judge, who had the benefit of seeing and studying this frail woman as she testified on the witness stand, was justified in concluding, after a careful consideration of the facts in the case, that the acts of misconduct on her part were largely due to her rundown physical condition and her highly nervous temperament. In order to improve herself, she voluntarily went to the hospital at Ann Arbor and there, for the first time, seems to have come to a realization of the fact that she might, by an effort on her part, overcome her extreme sensitiveness and her nervous temperament. Coming back to the old homestead where her mother-in-law had taken her place and making an overture for reconciliation shows a disposition on her part which, at least, is to be highly commended.

Under these circumstances, we are not inclined to disturb the conclusion of the trial judge, who, as before said, had the great advantage of seeing and hearing the witnesses and of obtaining an impression as to whether the breach which occurred is one which might not possibly be healed.

The decree will be affirmed, with costs to the defendant.

BIRD, C. J., and SHARPE, MOORE, STEERE, BROOKE, FELLOWS, and STONE, JJ., concurred.