NOLAN *v.* NOLAN.

1. DIVORCE—WIFE'S EXTREME CRUELTY—EVIDENCE—SUFFICIENCY.
   In a suit for divorce by the husband on the ground of
   extreme cruelty, evidence examined, and *held*, insufficient
   to sustain the allegations of the bill.

2. SAME—CROSS-BILL—HUSBAND'S EXTREME CRUELTY—EVIDENCE
   —SUFFICIENCY.
   ' On defendant's cross-bill charging plaintiff with extreme
   cruelty and with conspiring with his brothers and sisters
   to defraud her out of her alimony rights, evidence *held*,
   sufficient to entitle defendant to a decree.

3. SAME—ALIMONY—SUFFICIENCY.
   Where plaintiff, prior to his property settlement with his
   brothers and sister, had title to property valued at from
   $40,000 to $45,000, the decree of the court below awarding
   defendant $2,000 as permanent alimony, and $300 for
   attorney's fee, will be modified to $2,500 and $500
   respectively, the same to be a lien upon the homestead to
   take priority to the mortgage thereon given by plaintiff to
   his brothers and sister at the time of his settlement with
   them.

Appeal from Kent; Perkins (Willis B.) J. Submitted January 4, 1921. (Docket No. 1.) Decided March 30, 1921.

Bill by John Nolan against Rosetta Nolan for a divorce. Defendant filed a cross-bill alleging a conspiracy between plaintiff, Thomas Nolan, and others. From a decree for plaintiff, defendant appeals. Modified.

*Edward N. Barnard,* for plaintiff.

*Charles G. Turner* and *John J. McKenna,* for defendant.

214—Mich.—4.

BIRD, J.    John Nolan, the plaintiff, and Rosetta Nolan, one of the parties defendant, were married in February, 1917.    They resided at Walker station, a suburb of Grand Rapids.    At the time of the marriage John Nolan was a bachelor, 62 years of age.    Rosetta was a widow, 54 years of age.    The parties lived together until March, 1918, when John went elsewhere and left Rosetta in possession of the homestead. The claim made by John in his bill of complaint is that defendant was guilty of extreme cruelty toward him, and that he was unable to live with her.    Defendant Rosetta denies the extreme cruelty charge in the bill and sets up affirmative matter charging plaintiff with extreme cruelty, and also charging that he was in a conspiracy with his two brothers and sister to defraud her out of her alimony rights.    As a result of these latter charges plaintiff's brothers, William and Thomas, and his sister, Mary Harmon, were brought into the case.    They answered and the matters went to a hearing.    After a somewhat protracted hearing the chancellor was of the opinion that plaintiff's charges of extreme cruelty had been sustained and a divorce was accordingly granted to him, with alimony of $2,000 to defendant; also the furniture which had been purchased by them.    Defendant's cross-bill was dismissed.    Defendant was dissatisfied with this result and has the case here on appeal for review.

1. The principal items of extreme cruelty relied upon by plaintiff were:

(a) That defendant attempted to poison him and refused to care for him in sickness.

(b) That defendant nagged him for a conveyance of some of his property or for a joint deed thereof.

(c) That defendant was a nagger and was profane, vulgar and abusive.

(d) That she insisted upon quarreling with his relatives and attempted to alienate him from them.

When the parties were married plaintiff was engaged in the business of farming. He had been a farmer all his life on the farm upon which he then lived. After the parents died the plaintiff and his brothers and sister continued to live on the old farm, and as the years went by they added a considerable acreage thereto. The title to all the property was in plaintiff. When plaintiff was married his sister with her three children moved a short distance away. It naturally made some ill feeling in the family to have their living relations interfered with and a new person brought into the family. There was some proof of ill feeling, but nothing of a serious nature took place, although it was shown that latterly Mrs. Harmon, the sister, did not speak to defendant. The record is somewhat voluminous but after going over it carefully I am not impressed that any of these complaints are sustained. The principal testimony given in support of them came from plaintiff, but his testimony was weak and contradictory and at times appeared to be given in a reckless spirit and, most of all it lacks corroboration. If all the misdeeds of defendant testified to by plaintiff are to be accepted as true I seriously doubt whether it could be said that his allegations are sustained. A reading of the entire testimony gives one the impression that plaintiff's brothers and sister were very much disturbed over plaintiff's marriage, that they did not like defendant for this reason, and that plaintiff under this influence grew tired of defendant and of the new mode of living, and made up his mind to get rid of defendant and restore the *status quo.*

2. We agree with the conclusion reached by the chancellor that the parties should be legally separated, but we are of the opinion that defendant should be given the decree on her cross-bill. Along early in the fall of 1918, plaintiff evidently made up his mind to

get rid of defendant if he could. From that time on his conduct toward her changed and he began to be disrespectful to her and criticize her. Along the forepart of October his brothers and sister commenced separate suits against him for services. It appeared to be their claims that they were entitled to three-fourths of the property, which was valued at between $40,000 and $45,000, but instead of attempting to get a three-fourths interest they sued for the value of their services, making claims which would equal about three-fourths of its value. Plaintiff made no mention of these suits to defendant until the evening before they were to be tried, on January 11th. Then he invited defendant to go down to Grand Rapids with him to the trial on the following day. While there the suits were amicably settled by plaintiff conveying to them three-fourths of the estate, or just what they claimed. Plaintiff retained the homestead and as this was regarded as worth more than one-fourth of the estate he gave them a mortgage thereon for $2,000. After these matters were arranged plaintiff commenced to nag defendant about settling with her, and repeatedly raised the question with her and desired to know whether she would settle for $2,000. She advised him she would not, that she was not asking for any money. From this time on plaintiff's conduct became more insolent. He urged defendant to get a divorce from him and sought in many ways to make life a burden for her. He discovered that defendant took some pleasure in talking over the telephone to her friends in Grand Rapids, and he had the telephone taken out. When he refused to have it reinstated defendant arranged with the Bell telephone people to install one, but, when a man came to do so, plaintiff would not permit it. Plaintiff charged defendant with attempting to poison him, when, so far as the proof shows, there was nothing to it. This, however, became

a matter of neighborhood gossip and greatly chagrined and embarrassed the defendant. He charged her with attempting to choke him at night while they were in bed, but the proof does not show that there was anything to this. Finally he refused to room with defendant and refused to cohabit with her and afterwards deserted her. The record shows she bore the taunts and repeated insults of plaintiff and endeavored to get along and live peaceably with him, but in this respect she was not successful. Plaintiff's conduct, especially after getting his property matters arranged, was that of a man who was attempting, by his insolent and abusive conduct, to drive his wife to desperation and divorce. We think the decree should be granted to her.

3. It is not our intention to discuss to any considerable length the question of the conspiracy charged against plaintiff and his brothers and sister, or to disturb the conclusion which was reached by the chancellor in that regard, except in one particular which will be referred to later. Our views on the amount of alimony that defendant should have render a discussion of that question unnecessary. We might say, generally, that we are convinced the settlement and conveyances were not made in good faith. It is true the testimony shows that Thomas and William assisted plaintiff more or less on the farm and that Mary did the work in the house, but the record also shows that they were compensated in part as they went along for so doing. We are not prepared to say they were not entitled to some equitable interest in the property but we feel quite certain that they received more than they were entitled to, and that they would not have received so large a share had it not been for the prospective divorce proceedings, and that a settlement would not have been made when it was had it not been for an attempt upon their part to embarrass defend-

ant in obtaining her alimony rights when the question of divorce should arise. We think defendant, Rosetta Nolan, should have a decree of divorce on the ground of extreme cruelty. That the allowance to her by the chancellor should be increased from $2,000 to $2,500, and that her attorney fees should be increased from $300 to $500, and that these sums should be made a lien upon the homestead where defendant is now living until the same are paid. We are further of the opinion that this lien should be made prior to the lien of the mortgage which John gave them at the time their settlement was made. Aside from this the decree may stand as made by the chancellor. Defendant will recover costs of this court.

STEERE, C. J., and MOORE, WIEST, FELLOWS, STONE, CLARK, and SHARPE, JJ., concurred.