HAMMOND v. HAMMOND.

1. DIVORCE—CASE HEARD DE NOVO ON APPEAL.
   On appeal from the decree in a divorce suit, the Supreme
   Court hears the case *de novo*.[1]

2. SAME — NONSUPPORT — EXTREME CRUELTY — EVIDENCE — SUFFI-
   CIENCY.
   In a suit for divorce on the grounds of nonsupport and
   repeated extreme cruelty, evidence examined, and *held*,
   insufficient to sustain the allegations in the bill of com-
   plaint.[2]

3. WITNESSES — DIVORCE — CALLING OPPOSITE PARTY FOR CROSS-
   EXAMINATION—STATUTES.
   While, under the statute, the calling of the opposite party
   for cross-examination is permissible, such right in divorce
   proceedings should be exercised sparingly and to reach
   relevant facts difficult or incapable of proof otherwise.[3]

Appeal from Wayne; Webster (Clyde I.), J.    Sub-
mitted January 27, 1926.    (Docket No. 78.)    De-
cided April 14, 1926.    Rehearing denied June 7, 1926.

Bill by Juliet K. Hammond against Charles F.
Hammond for a divorce.    From a decree for plaintiff,
defendant appeals.    Reversed, and bill dismissed.

*George E. Brand,* for plaintiff.

*Monaghan, Crowley, Reilley & Kellogg,* for defend-
ant.

WIEST, J.    This is a suit for divorce on the grounds
of nonsupport and extreme and repeated cruelty.    In
the circuit decree was granted plaintiff, on both
grounds, with an award of $225,000 permanent

[1]Divorce, 19 C. J. § 473; [2]Id., 19 C. J. § 367; [3]Witnesses, 40
Cyc. p. 2414.
   On the question as to whether extreme cruelty is ground for
divorce, see note in 18 L. R. A. (N. S.) 300; 34 L. R. A. (N. S.)
360.

alimony.    Defendant denied the charges, made no counter charges and asked for dismissal of the suit. Defendant appealed.

We hear the case *de novo.*    Outside of the social and financial standing of the parties, the case is the ordinary one for divorce.    The parties were married April 25, 1900, and have three children, all of mature years.    Plaintiff received voice training, in this country and Paris, fitting her for a public career, but love and marriage intervened to prevent, but never to still the desire to place her vocal talents before the public.    Defendant, at the time of the marriage, was a man of means and is now worth upward of half a million dollars.

The specific allegations of extreme cruelty and non-support made in the bill are, briefly stated, as follows: That defendant manifested a desire to humiliate her; wounded her feelings; ignored her and her rights and privileges in the rearing of the children; refused to supply necessary funds or permit her to incur indebtedness for personal requirements; refused to pay bills; ignored her in purchasing a home; excluded her from participation in employing servants; shamed her by not introducing her to the servants; placed the household exchequer under control of the children; educated the children at a cost greatly in excess of the degree in which she was maintained, thereby compelling her to endure the humiliation of not having even necessities, while the children were enjoying a superabundance; unjustly and to humiliate her discriminated against her in favor of the children; refused to pay for tree trimming and many minor items of household and family expense; left her in suspense even when he paid bills; refused to pay a bill of $20 for monogramming a table cloth and napkins; refused to pay for monogrammed bath towels; paid the servants himself; refused to permit the laundress to

continue unless she washed and ironed in one day, resulting in plaintiff doing her personal things and the finer household linens; limited her to one servant, and this compelled her to wash the bathroom floors and do other cleaning; assumed a petty attitude towards her war activities; made her a recluse by his criticism and upbraidings and rudeness to friends and guests; so depleted her wardrobe by refusals of maintenance as to make her ashamed to appear in company; refused to accompany her to social functions and at times to talk to her; has, by neglect and refusals, compelled her to have her clothes made over, and to wear clothes of the children; that a coat she purchased on credit in 1919 has not been paid for, has become frayed, but is still worn because she has no funds; that she has had to borrow car fare from friends and the servants. These allegations presented the issues at the hearing, although it was proper to show other like acts of neglect, cruelty and nonsupport to characterize the acts specifically alleged.

Reasonable limit to an opinion forbids an extended discussion of all the evidence and in many instances we will merely state conclusions reached in our consideration of the evidence. Most of defendant's wealth is in unimproved and unproductive but valuable real estate, owned by him at the time of the marriage, and his income has largely consisted of his earnings.

Due consideration of this voluminous record fails to satisfy us that defendant has been guilty of nonsupport or extreme cruelty justifying a decree of divorce. In addition to an oral opinion, the circuit judge signed and filed "findings" somewhat like in a suit at law, and, as we are not in accord with his conclusions, we will state the view we take of the evidence in passing upon the issues.

The trouble leading to the filing of the bill was of

long standing, and, we are satisfied, arose out of plaintiff's failure to realize the high hopes she entertained of a public career.    We have here, evidently, the case of a woman filled with desire to be in the public eye; who felt that in marrying defendant his money would command for her a social position enabling her to give wide range to her vocal talent, but who found that the man's income would not admit of her ambitious schemes and also found that the bearing of babies, their care and welfare, together with housewife duties and management, prevented realization of the public appearance she desired, and who fretted under the restraint common to marriage and longed for liberty, as she said, "to live the life for which she was fitted."    This is revealed in two letters written by plaintiff in 1907, and they also disclose an attitude manifested from that time and illuminative of subsequent events.

Plaintiff testified about one of the letters as follows:

"That undoubtedly expressed my feeling at that time, and the thoughts I expressed at that time have, along certain lines, been continual thoughts practically from that time to the present."

The letters follow:

"July 10th, 1907.

"*My Dear Charlie:*    There is much I would say to you in answer to your letter of Sunday and yet I scarcely know where to begin.    You accuse me of indifference to your circumstance.    Well, perhaps you are right.    I am still quite of the opinion that you deceived me utterly in regard to this cottage business. To say that I am angry is putting it mildly.    I tell you frankly that if it were not for the babies, that I should never witness another day.    A disappointment to you, as you say, a total disappointment to myself in every respect.    A square peg in a round hole.

"Your family hate me.    My own are as nothing now, hampered in on all sides with limited means to do the things that nature intended, and these beings for

whose future welfare I am sponsor.    Oh, God, oh, God, Thy Hand of retribution is heavy on me.    He alone knows the outcome, it seems pretty black just now.    The future seems an impossibility.    I warned you before I left there that if I found an opening to earn my own living that I should embrace it, and I mean it absolutely.    You are not inclined to money making; you seem to be satisfied with what you have, whatever that may be.    The children's future, oh, God, to think of sinking down to the level of a plodder, a nonentity, and worse for the children.    I think I better not write any more, for I am in such a state I'll say things I am sorry for.    But I mean every word of this.    I am discouraged, disheartened and disappointed.    The children keep well and happy and seem to enjoy the bathing since they began Saturday. I started in to play tennis with Mrs. Clark today. It is violent exercise, it certainly ought to take flesh off, although I have lost quite a bit since I got down here for some reason or other.    Tell Floss not to get discouraged, that I am really going to send her alfaghans along, and that I'll be able to send her one like I gave Viola (the one we bought at Atlantic City). Mrs. Clark knows how to make it.

"With much love from all,
"Affectionately,
"JULIET."

"*My Dear Charlie:*    This is not an answer to your letter of Thursday, it is too late for me to write all I would say to you.    The Clarks dined here tonight and have only just left and it is almost twelve.

"My dear husband, I did not sit down in cold blood and write that letter to you Tuesday.    It was all I could do to write at all, the tears were so blinding. Yes, I am going through a very great conflict.    I am very unhappy; you know without my telling you what I want to do.    I want so to sing and lead the life I love.    It is my temperament and the older I grow the stronger the call is upon me.    You don't understand, because you don't feel.    If you do you hide it absolutely.    You probably have thought that with added years and added cares, with the babies, that the desire would diminish, but it is not so.    I am ambitious, extremely so.    As long as I have not the money to

swing a social position, which I think I should enjoy and which I think I could make a success of, I turn to my music which nature fitted me for.    You cannot deny that.    You should know and understand that I have been very much hedged in and it simply is that the bird cannot stand the cage.    It is not, dearie, that I don't love you and have faith in you.    But, I desire so much for myself I want to accomplish so much and my hands are tied on all sides.    Human flesh cannot stand the fetters that bind without crying out some time.    Don't you understand, can't you feel a little bit how I feel?

"I want to write you so much tonight, but the pen won't run, so I'll write you tomorrow, dearie.

"Affectionately,

"JULIE."

The expenses of his family, as hereinafter shown, reached a point where some retrenchment was essential, and reasonably could have been had without hardship to any one, and in this stress he was entitled to have the hearty co-operation of his wife. This he did not have and he was forced to adopt measures and means to bring the family expenses within reason and take precautions to keep control thereof.    In the summer of 1920, conditions with respect to finances became acute by reason of his knowledge that he was going to lose the salary of $26,000 a year paid him by the Hammond-Standish Company, and, being aware that the family expenses had been $42,000 the year before, held a family council with his wife and daughters, told them he was in a precarious condition, financially, and it was absolutely necessary to curtail the family expenses.    He called their attention to the amount of money he had paid out for living expenses the year previous, and proposed that he pay $400 per week from then on for bills and expenses, and stated that whatever was left might be divided between his wife and daughters. Plaintiff paid little attention to the proposition beyond

asking who would handle the check book, and, upon being informed that the daughter Juliet would draw the checks and keep the accounts, she left the room with the announcement that she would have nothing to do with the running of the house and would not accede to the plan. She did not carry out the threat to take no part in family management, but about that time became interested in outside activities, starting with the Gordon-Crimi concert which proved unsuccessful, then the Detroit Concert Bureau, also unsuccessful, then the bringing of grand opera to Detroit, in which effort she received $1,450 salary, but, upon the failure of the affair, she asked defendant to reimburse this amount and he did so. She also claims he agreed to pay all her other bills at that time and she turned them over to him and has suffered from the suspense of not knowing whether they have yet been paid. We feel that the expense so placed upon him offset any suspense she experienced. We do not think she suffered much about this but rather washed her hands of the whole matter when he assumed the burden of taking care of the bills.

Defendant is charged with cruelty in placing power to draw checks for family expenses first with the daughter Juliet, and, when she married, with the daughter Ethel. This it is claimed was a humiliation of plaintiff and destroyed her right to manage the home and participate in the manner a wife should in the domestic affairs. Two reasons appear for this action, (1) a wilful disregard of repeated entreaties to keep expenses within reason and income, (2) a desire to have his systematic method of keeping account of expenses continued. There was also the lesser reason of educating the daughters to keep accounts, but this has little appeal. This record establishes complete justification for the restraint applied.

It is claimed that defendant's stinginess made living

with him a succession of humiliating incidents by way of continual repression of reasonable expenditures essential to domestic happiness.    Considering the advantages and pleasures accorded the family and expenditures made in their behalf, it is difficult to reconcile the claims of plaintiff with defendant's liberality plainly demonstrated and .clearly established by the proofs.    Inasmuch as plaintiff claims that nonsupport ran practically the course of their married life, we may well notice the following expensive summer outings.    The summer of 1906, the family, with a nursemaid, occupied a cottage at Bass Rocks, Massachusetts, taking their meals at the Hotel Moorlands.    The summer of 1907, the family, with a cook, a maid, and a governess, were at Magnolia, Massachusetts.    That year a chauffeur was engaged and with an automobile owned by defendant was at the service of plaintiff. In 1908, the family, including defendant, together with a governess and the chauffeur, went abroad and toured England and France for about two months.    In 1909, the family had a house at Grosse Pointe for the summer.    The summer of 1910 was partly spent at the Old Club and in the fall the whole family went to Colorado Springs and were at the Antlers Hotel for about two weeks; then the daughters and defendant came home and plaintiff and the son had a cottage at Broadmoor, a suburb of Colorado Springs, where they remained, on account of the health of the son, until December.    In 1911, the family spent part of the summer at Virginia Hot Springs and Atlantic City.    In 1912, plaintiff was ill and spent most of the summer in a sanitarium at Watkins Glen, New York, and the children, with a cook and maid, were at Bass Rocks.    During the summer defendant motored to Watkins Glen and with plaintiff joined the children at Bass Rocks for about ten days.    In 1913, the children were in summer camps in New Hampshire

and plaintiff was at Whitefield, a summer resort in the White Mountains, visiting defendant's sister but spending some time at the Mountain View House. In 1914, the family again spent the summer at Atlantic City and Virginia Hot Springs, the children being in camps part of the time. In 1915, the family, accompanied by defendant, made a trip through the Canadian Rockies to Vancouver, and along the coast to San Francisco and San Diego, taking five or six weeks. In 1916, the entire family made a trip through the Glacier National Park, then to Vancouver and returned by way of the Canadian Rockies. In 1917, the son was in camp in northern Michigan and the rest of the family, including defendant, made an automobile trip to Alexandrine, then by boat down the St. Lawrence to Quebec and Saguenay, returned to Alexandrine, and by way of Lake Champlain motored to New York and home. His means barely justified the early summer outings, and in 1913 his finances did not justify the expense, and he was much worried over the subject and requested plaintiff to co-operate in reduction of expenses by remaining home with him. This she did not do.

We now state defendant's gross income and expenditures by years commencing in 1906: 1906, income about $15,000, expenditures about $18,000; 1907, income $25,000, expenses $17,000; 1908, income $29,000, expenses $27,000; 1909, income $30,000, expenses $22,000; 1910, income $32,000, expenses $23,500; 1911, income $21,353, expenses $28,200; 1912, income $21,086, expenses $22,839; 1913, income $14,652, expenses $23,094; 1914, income $18,502, expenses $24,376.

Net income over and above taxes, interest and business expenses: 1915, $21,961, family expenses $24,721; 1916, $41,444, family expenses $25,074; 1917, $36,807, family expenses $24,707; 1918, $59,275,

family expenses $34,017; 1919, $57,799, family expenses, $42,029; 1920, $22,974, family expenses $31,461; 1921, $14,756, family expenses $21,768; 1922, $6,159, family expenses $22,259; 1923, $14,432, family expenses $21,509.

Before his marriage, and since, defendant has kept an itemized account of his income and expenditures, and he was able to give definite information therefrom of his family expenses during all the years. This habit of his seems to have been unknown to plaintiff, and she apparently thinks now that it is an evidence of penuriousness on his part, and our attention is called to the fact he made record of so small an item as the purchase of a few postage stamps, and kept track of sums paid the help and others. He does not seem to have been more meticulous than George Washington in the matter of accounts. His records of family expenses stand him in good stead and if he saw fit to keep an account of small sums we do not feel called upon to take it as an evidence of petty meanness. The daughter Juliet had studied typewriting, shorthand, and bookkeeping. When defendant was about to go to Europe on a business trip in the spring of 1919, he asked the daughter Juliet to act as secretary while he was away, told her he had placed sufficient money in the bank to meet expenses, and said he would like to have the expenses kept within $1,700 a month, and to furnish her mother with such funds as she should request. He also gave plaintiff two checks for $500 each, one of which he post dated. The family traveled to New York, and when he sailed went to Atlantic City for a week, stopping at the Marlborough-Blenheim Hotel. From there plaintiff went to Washington with the son for a few days, then returned and for a week or ten days stopped at the Biltmore. Defendant was away about four months, and upon his return found the family ex-

penses during that period had exceeded $1,700 a month by about $3,000. This shows to some extent what defendant had to contend with even while his daughter handled the check book.

There is such a thing as the right of the husband to honestly endeavor to keep expenses of the family within reason. In this respect he never had the co-operation of plaintiff. While the parties were living in a rented house on Parker avenue, plaintiff expressed a liking for a neighboring house. In the summer of 1914, while the family was away, the furniture was stored, and defendant purchased the house plaintiff had admired, and, intending to give her a pleasant surprise, engaged help, took the furniture out of storage and furnished the new home. Defendant then invited plaintiff and his sister, with whom plaintiff was then staying at Pontiac, to come and see the new home. Plaintiff claims it was cruel to go ahead without consulting her and to engage the help, and that defendant introduced his sister to the help but ignored plaintiff. The purchase and fitting of the new home was a surprise to plaintiff but not of the nature intended by defendant. Just why he overlooked introducing his wife to the help we do not know, but we do know it was an oversight easily remedied by just a little time, for it would not take the help but a few minutes to sense who was mistress of the home. We would pass this matter without comment, if it were not for the fact that there seems to be an impression among some people that trifles out of court take new color when solemnly paraded in court. Resentment over not being consulted about the purchase of the home, and humiliation at not being introduced to the servants, was evidently of short duration, for, the old furniture being inadequate for the new home, she went with defendant to New York, Philadelphia, Richmond, and Grand Rapids and

selected rugs, draperies and furnishings costing nearly $10,000. He did object to the expense of mono-gramming bath towels and wash cloths and thought it quite useless even for table cloths. He might well have acceded to plaintiff's wish in this trifling matter, but we cannot raise his refusal to the dignity of extreme cruelty. It was one of the petty differences quite likely to arise and usually composed by the exercise of a little common sense, or acquiescence of the husband. He also objected to the amount of a bill rendered by a doctor, and wanted her to see if it could not be reduced. It does not appear that she even attempted to carry out his wish, and it does appear that he paid the bill. This was not cruel. It would be strange indeed if a husband's prerogative to demur to bills when he thinks them too high is cruel even when he goes and makes payment. The breadwinner of the family may, if he feel justified, speak in defense of his pocketbook.

Plaintiff engaged a man to care for four trees at the home at an expense of $30 a year and defendant said the trees were not worth such expensive care and stopped it. Most wives would either leave such a matter to the husband, or at least consult with the husband about it. Defendant had a right to stop the care of the trees and plaintiff should have had sense enough to forget the matter, instead of treasuring the memory and bringing the petty subject to court in aid of a severance of bonds of matrimony. It would be ridiculous to say that this trivial matter was so cruel as to render the continuance of the marriage relation intolerable. Of course, we understand that this was but one incident, but what we have in mind is that it is too small to even be weighed in the balance.

Plaintiff claims that while she was at Colorado Springs, in the fall of 1910, defendant did not

furnish sufficient funds although she entertained but little.  We notice that while she was there, for the month ending November 15th, she ran a bill for "drinkables" at a club, amounting to $53.35, and tabulated in the now obsolete terms of 7 rye, 2 gin, 2 Scotch, 3 vermouth, 4 champagne, 1 sherry and 2 claret.  The record does not disclose more clearly the indicated quantities, but it being in pre-Volstead days we may assume, for instance, that 7 rye at $1.75 per, was some quantity more generous than 7 drinks.

At the hearing defendant was called as the first witness for cross-examination, and 339 pages of the record are taken up with such examination.  It would seem that in a suit for divorce the plaintiff ought to be able to present her case without starting out with a long inquiry into the finances and business dealings of defendant covering nearly a quarter of a century.  The statute, however, permits the calling of the opposite party for cross-examination, but its permission should be exercised sparingly and to reach relevant facts difficult or incapable of proof otherwise.  It was important to show that defendant was possessed of means with which to have supported plaintiff, and the amount and nature of such means in case of divorce with alimony, but we cannot but feel that the examination went far beyond such purposes.  We have small interest in old-time history of defendant's business connections beyond knowing what income reached him.  In the course of such examination defendant stated he had a reason for not recording the deed to the home he purchased.  Being asked to give the reason, he stated:

"I would prefer not to state in open court.  I would be pleased to tell the judge the circumstances."

Counsel for plaintiff said:

"Well, I insist that you tell in open court what was the circumstance that you claim made it desirable on

your part to keep this property from getting in your name on the record."

Defendant still demurring, counsel appealed to the court to compel him to answer, and the court ruled that counsel was entitled to an answer.    Thereupon defendant testified:

"Mrs. Hammond confessed to me that she had been unfaithful and had interests in other directions; she could not continue any longer to live with me."

The circuit judge in his "findings" stated:

"That the testimony of the defendant to the effect that plaintiff confessed to him misconduct on her part is not corroborated by any testimony and I believe it is untrue.    There is no testimony that plaintiff has been guilty of any misconduct."

Defendant had made no such charge in any pleading, raised no such issue, and tried his best to be excused from stating it in open court, and his counsel let the matter end with the examination of counsel for plaintiff.

In his brief counsel for plaintiff says:

"The charge in this case was broadcasted direct to the public.    The chancellor expressly found defendant's testimony untrue.    The charge had all the cruelty in it that human ingenuity could employ.    That he charged plaintiff with being a self-confessed adulteress illustrates this.    Not a scintilla of proof, circumstantial or otherwise, was offered in support of his testimony.    This was the 'packer's brand!'    It confirms the existence of the intense cruelty manifested for years."

The publicity complained of came at the insistence of counsel for plaintiff and over the protest of defendant that he ought not to be made to answer in open court.    It was not an issue under the pleadings, no such charge had been previously made by defendant, it was not volunteered at the hearing and was not

a subject involved in the circuit calling for decision, and we decline to pass on the truth or falsity thereof, and much less to hold it was untrue and upon such premise consider it confirmatory of the existence of long-time extreme cruelty. Plaintiff denied being unfaithful and denied the claimed confession. We have mentioned this matter somewhat at length because counsel for plaintiff stresses it in his brief and the circuit judge thought it an issue calling for his finding thereon. It was not an issue, defendant had no right to offer supporting proof, if he had any, and it is too serious a matter to be decided at all without giving the parties an opportunity to try out such an issue. We decline also to characterize it as the "packer's brand," whatever that may be. It was a most unfortunate happening, but we assume counsel for plaintiff was wholly unaware of what the answer might be.

Plaintiff says defendant insisted she remain more at home and if she needed exercise to take it in the garden. This request, if made, was not productive of results. Mrs. Hammond was active in civic, musical, art, and war matters. At the outbreak of the war she entered the National League for Women's Service. Prior to that she had been connected with a great many matters of civic interest, principally in executive capacities. She was a Colonial Dame and historian thereof. She assisted the Young Women's Christian Association in putting on a pageant under the backing of the Grace Whitney Hoff Federation of Clubs. In this she acted as general chairman, and had to supervise many of the 640 costumes. She was an executive assisting in the arrangement and detail of putting on a play for the benefit of the Chinese Famine Fund. She was appointed chairman of a committee intent on cleaning up the alleys and streets of Detroit. She was active in various benefits put on

by the Theatre Arts Club. She had to do with the benefits for the purposes of scholarships for the College Club. She sang in many churches. She was appointed commandant of the commissary department of the National League for Women's Service, and was active in feeding soldiers. She made a wide investigation with reference to malnourished children. We have mentioned some of her activities. It does not appear that she was restrained from taking part in public activities. In justice to her, it should be said that in some of her activities she rendered splendid public service.

We note in the opinion of the circuit judge severe criticism of the conduct of the daughter Ethel, falling within his observation in the court room. Ethel was not a witness, and of course her conduct mentioned does not appear in the record. We only notice this because the circuit judge thought it important enough to comment upon it. The circuit judge did not rest decision upon Ethel's conduct, and could not, and we pass it as of no moment in the case.

We have gained an opinion from the record directly opposite to the view of the circuit judge that defendant was not open and fair in giving testimony. We are impressed that he was eminently fair and was admirably patient under a searching examination of all his pecuniary and business dealings for many years. Defendant is not free from censure. It was petty meanness to send back a hat she had purchased. He should have known how dear a hat is to a woman and have grinned and made the best of it, as husbands are wont to do.

When word came that the daughter Ethel was sick and plaintiff wanted to go east to render her care and attention, defendant insisted that he go and she remain home, and he went, and two days later plaintiff followed. No excuse appears for this unkindly

postponement of the mother's desire to reach the sick bed of the daughter. No serious consequences were occasioned by the delay, and as it happened many years ago we cannot feel that the incident warrants dissolution of the bonds of matrimony.

Plaintiff is not free from fault for the unseemly incident attending her effort to start for New York with Ethel without letting him know anything about it, and his going to the depot and upon her refusal to return home taking Ethel with him. He had good reason to suspicion that the secrecy with which she departed from the home portended something more than going on a visit, and in the stress of the moment, and in the light of subsequent events, he did a foolish thing. Both were at fault in this matter and plaintiff is in no position to make capital out of the affair.

Cash given plaintiff after the family conference was somewhat meager, but we do not overlook her asserted independence and engagements in various semi-public enterprises, and feel that such account in a large degree for the falling off. When her undertakings proved disastrous he was saddled with the bills and accounts she had run. We notice in the business ventures she borrowed $5,000 one place and $1,000 another. While these borrowings had nothing to do with her support, because used in the ventures, she undoubtedly expected she would be successful to the point of being independent of her husband, and we are not inclined to accept her failure as a reason for visiting him with the same blame as though she had not made the ventures. Defendant did not pay the $6,000 borrowed for the enterprises, but did pay back the $1,450 she had received as salary and assumed and paid bills she had run. We are disposed to let the plaintiff abide the self-imposed meagerness of cash contributions after the family council.

The case has received careful consideration, we have

had the benefit of able arguments and helpful briefs, and we find no sufficient cause for divorce.

The decree in the circuit is reversed, and a decree will be entered here dismissing the bill, without costs to either party.

BIRD, C. J., and SHARPE, SNOW, STEERE, FELLOWS, CLARK, and MCDONALD, JJ., concurred.