FRESBY v. FRESBY.

DIVORCE—EXTREME CRUELTY—EVIDENCE—SUFFICIENCY.
Where the evidence is insufficient to justify a decree of
divorce on the ground of extreme cruelty to either the
wife on her bill or to the husband on his cross-bill, the
decree of the court below granting a divorce to the hus-
band is reversed, on appeal, and bill and cross-bill dis-
missed.

Appeal from Muskegon; Vanderwerp (John), J.
Submitted June 15, 1926. (Docket No. 109.) De-
cided June 6, 1927.

Bill by Elizabeth Fresby against Carl Fresby for
a divorce. Defendant filed a cross-bill for a divorce
and custody of minor children. From a decree for
defendant, plaintiff appeals. Reversed, and bill and
cross-bill dismissed.

*Joseph F. Sanford,* for plaintiff.

*Alexis J. Rogoski,* for defendant.

STEERE, J. This bill of complaint was filed Novem-
ber 24, 1925, for the purpose of obtaining a decree
of divorce from the defendant, and for other relief.
Defendant filed an answer in denial with a cross-bill.
The trial judge denied plaintiff relief, but granted
that asked by defendant. Plaintiff brings the case
into this court by appeal.

The parties were married December 4, 1918, and
lived together until November 21, 1925, when plain-
tiff took her two children, Carol aged 5 years and
Richard aged 3 years, and went to her mother's home,
where they were living when this case was commenced.

Divorce, 19 C. J. § 482 (Anno); 41 L. R. A. (N. S.) 597; 9
R. C. L. 334, 476; 2 R. C. L. Supp. 810; 4 R. C. L. Supp. 608;
5 R. C. L. Supp. 513.

She charged in her bill that defendant had been guilty of extreme and repeated cruelty in various ways, particularly alleging that he insisted upon having sexual intercourse with her against her protest when she was pregnant, ill, and physically enfeebled, that he cursed and swore at her, calling her vile and indecent names, etc.   She further averred that they have a joint equity in their home approximating $1,200 in value, and prays for absolute divorce, custody of their children, a share in the property, and for alimony.

Defendant in answer denied all the accusing material averments of her bill, and asked for affirmative relief in his cross-bill charging her with cruel treatment of their children and himself, and unwifely conduct implying infidelity, in the following particular:

"That much to the chagrin, humiliation and mortification of the defendant, said plaintiff has persisted in going about with and appearing in public with other men; that on, to wit, November 12, 1925, Thursday, said plaintiff purported to attend a meeting of the dining room committee of the Royal Neighbors, which would adjourn about 9 o'clock, but that the plaintiff did not return until 11:30 o'clock, and then in company with a man, whereupon plaintiff admitted that she had attended a dance; that on Thursday, November 19, 1925, defendant saw plaintiff meet a man on the northeast corner of First street and Clay avenue, in the city of Muskegon; that plaintiff and said man proceeded on and along First street to Monroe street, turned east on Monroe street, and proceeding on and along Monroe street to Jefferson street, turned north on Jefferson street and proceeded on and along Jefferson street to the rear of the Muskegon Business College and disappeared in the alley to the rear of said business college, where plaintiff and her companion were lost sight of by defendant.   *   *   *

"Said plaintiff manifests her temper by cruelly and inhumanly punishing the children of the parties; that the boy, Richard, has lately undergone two operations, from which he has not fully recovered; that on Novem-

ber 16, 1925, plaintiff struck the boy on the nose with such force and violence that she caused the nose of the boy to bleed for two days; and that it is not unusual for the plaintiff to punish the children in such an inconsiderate manner."

Averring plaintiff to be an unfit person to have the custody of their children, he prayed for a decree of divorce with their custody given to him.    Plaintiff answered his cross-bill in denial and explanation.    The case was heard upon pleadings and proofs taken in open court.

Plaintiff was sworn as a witness in her own behalf and stressed the claim that defendant insisted upon having sexual intercourse with her up to within a short time of the birth of their children and soon thereafter.    This defendant absolutely denied.    She also testified that she took in boarders and washing, worked in factories and contributed her wages to make payments on their home, and that $400 given to her by her father as a wedding present was applied on its purchase.    Her mother and step-father were called as witnesses.    Their testimony was meager, directed, beyond expressions of opinion, to her affection for, kind treatment of, and ability to properly care for her children, and denial of defendant's charges against her so far as known to them.    Two witnesses beside himself were called by defendant.    Their testimony tended, so far as it went, to support some of his charges as to his wife being seen on the street on November 19, 1925, with a man named Stewart under what he claimed were suspicious circumstances.    In stating his case on direct-examination, he was asked and answered as follows:

"*Q.* When was    *    *    *    the first time you had any serious difficulty arising between you?

"*A.* It was around last November.

"*Q.* And up until last November how had you two gotten along?

"*A.* All right.    Of course we had a few quarrels.

"*Q.* What happened in November that caused some difficulty between you?

"*A.* My wife left the house on the 12th of November and went to a meeting and I stayed at home with the children.    I kept them up until about 10 o'clock and then I put them to bed and about 11:15 the boy started coughing awfully, and I went and took care of him, and I happened to glance out of the window and I seen a woman and a man up at the corner and I watched them, and they stood there talking for about 10 minutes maybe more or less and then he went back toward Apple street and the woman came across the street and I seen it was my wife.    When she came in the house I asked her about it.    I did not recognize the man she was talking to.

"*Q.* And after that did you have any difficulty?

"*A.* She went up town one night to hold drill practice and I found out they got through at 10 o'clock, from one of the neighbors, they got home a little after 10 o'clock and my wife did not get home until 11:30.

"*Q.* Did you ask her where she had gone that night?

"*A.* No, I did not.

"*Q.* Did you say anything to her about arriving home late?

"*A.* No.

"*Q.* After that did you have any further difficulty?

"*A.* On the following day she went up town again; she was supposed to be up there at 4 o'clock and she didn't get there until after 7 o'clock; the meeting had been called.

"*Q.* Did you find out where she had been that afternoon?

"*A.* I did not.    I did not ask her, because that night she said she came home on the last bus with my sister and my sister came home at 10:30.    That was on the 17th of November.    My wife got home at 11:30 that night.    *    *    *    And after that, on the night of the 19th I was going down to bowl and she was going down with me.    *    *    *    And when we got down town we followed her, me and my brother, brother-in-law and myself.    We followed her down town as far as First street    *    *    *    and we lost trace of her    *    *    *    and finally we walked up Clay

avenue and I seen my wife coming that way and my brother-in-law they went on down Clay avenue and I went in the city hall to the rest room, and as it happened my wife came in right behind me and went in the ladies' rest room. I went out first and walked down Clay avenue toward First street and around that corner and I saw my wife coming too from the city hall and going toward that way, and I went down First street to the alley, to the alley in back of the bank from Clay avenue and I got back on Clay avenue and she was just going across First street on Clay, and she took 10 or 12 steps and came back to the corner, and I came to the other corner and she started south on First street and went about 12 steps and turned around and came back and met this man on the corner of First and Clay. I was standing about 50 feet from him when she met him.

"*Q.* About how long had she been waiting?

"*A.* She didn't wait right there, she just kept walking around. We followed them up First street as far as Monroe and down Monroe over to Sanford and down Sanford to Miller and on Miller street to Jefferson to the business college and we lost track of them. They went in the alley of the business college and I found out later that this Elman Stewart lives in the house back there, back of the business college on Western avenue. * * *

"*Q.* After you saw her meet this man did you talk the matter over with her?

"*A.* No, I did not. * * *

"*Q.* You complain here that your wife was severe in the punishment of the children?

"*A.* One time before she went away, I came home from work and I noticed the boy had a nose bleed, blood in his nose, and every time he would blow his nose cakes of blood would come out, and I asked my wife about it and she said that she had struck him across the face; that he had done something, and he was around that way, and his nose bled for two days and whenever he would blow his nose clots of blood would come out. He never had a nose bleed before."

Plaintiff's explanation of this transaction is as follows:

"I didn't slap the little boy on the face so hard that his nose bled for several days. His nose never bled for a single hour because I slapped him. It bled just for a minute and the doctor said it was from his operation that caused it, it wasn't because I hit him at all."

On cross-examination defendant testified:

"*Q.* You charge that Mrs. Fresby persisted in going about with and appearing in public with other men?

"*A.* How do you mean, persisted, I did not charge that.

"*Q.* It is in here (indicating paper).

"*A.* I did not charge that.

"*Q.* I will show you your cross-bill and ask you if you did not sign that? (showing paper to witness).

"*A.* She persisted in going about, but not with other men. * * *

"*Q.* It is a fact that she is kind to the children and takes good care of them?

"*A.* At times yes, and at times she uses them mean. To my knowledge she has a mother's love for the children. * * * I was at work at the time, in the afternoon. My wife was at the hospital with the boy for some time. He had an operation.

"*Q.* As a matter of fact your wife was there constantly with him?

"*A.* Well, it is a mother's duty to be there. She was there. I could not find the least fault with her concerning her care for that boy; she did all she could for him. * * *

"*Q.* As a matter of fact you have been with another woman than your wife.

"*A.* No, sir. I have gone over and played a couple of games of cards at the home of Mrs. Peterson. She kept the children. I didn't consider anything wrong about going over to her home and playing a couple of games of cards, I have been acquainted with her for 12 years. * * * My wife never complained about it. I complained about her walking up and down the street with a man I didn't know.

"*Q.* If you had known him it would have been all right with you?

"*A.* No, it doesn't look right. * * *

"*Q.* When you state that she was going about in public with other men you are referring to the one man on November 12th when you asked her who she had been with and the other man on the 19th of November?

"*A.* That is the only times I know about. * * * She kept two or three boarders. That was her own wish. The boarders were her brothers. They paid for their board. We have each made about half the payments on our house since the down payment of $400 was made—about $120 has been paid by her and about $150 by me."

Plaintiff had met and been introduced to Stewart at her parents' home when visiting there. Her explanation of what occurred on the evening of November 19, 1925, is as follows:

"*Q.* What were the circumstances under which you met him here in the city on the night of November 19th?

"*A.* I just happened to run into him that night. I came down town with my husband and he went to bowl and I was going down the street and I just happened to run into him and I had an hour or so to wait for Mr. Fresby and I went to his folks' place and waited. I did not go there to meet him."

The trial court found plaintiff guilty of extreme cruelty and granted defendant a divorce on that ground, held she was an unsuitable person to have the custody of her two small children, gave the father their custody and also their home, previously held by them as tenants by entireties. In a written opinion the court said:

"I have investigated the question as to what disposition should be made of the children, and I have conferred with the friend of the court regarding them. Having in mind such investigation as he has been able to make, I am not satisfied that the home of the plaintiff's mother is a proper place for these children to be brought up, under all the circumstances, but do not think it necessary for me to give further reasons

238—Mich.—38.

in that regard.    I am informed by the friend of the court that the defendant has a proper place to take care of these children, and I am going to place them in his custody as long as he furnishes a proper place."

The record does not show who was the friend of the court, what investigation he made, what he found out, or what he recommended to the court.    We have quoted substantially all of the testimony bearing upon the question of extreme cruelty as to each of the parties.    In considering that offered by the plaintiff, the fact should not be overlooked that her last child was born more than three years before she separated from her husband.    No one was called to show that she was physically weak and the trial judge saw how she appeared physically and mentally.    We think the trial court was right in holding that she had failed to show that she was entitled to a divorce.

We are unable to conclude defendant has established the fact that plaintiff was guilty of extreme cruelty, in the sense that it was a cause for divorce.    While no two cases in this line of inquiry are alike in detail of facts, the following are more or less illuminating as to the evidence of cruelty essential to justify a decree of divorce: *Cooper* v. *Cooper,* 17 Mich. 205 (97 Am. Dec. 182) ; *Bennett* v. *Bennett,* 24 Mich. 482; *Soper* v. *Soper,* 29 Mich. 305; *Johnson* v. *Johnson,* 49 Mich. 639; *Minde* v. *Minde,* 65 Mich. 633; *Reichert* v. *Reichert,* 124 Mich. 694; *Murnan* v. *Murnan,* 128 Mich. 680; *Downey* v. *Downey,* 135 Mich. 265; *Bowen* v. *Bowen,* 179 Mich. 574 (51 L. R. A. [N. S.] 460) ; *Eistedt* v. *Eistedt,* 187 Mich. 371; *Philley* v. *Philley,* 207 Mich. 672; *Nolan* v. *Nolan,* 214 Mich. 49; *Lewis* v. *Lewis,* 221 Mich. 73; *LeBlanc* v. *LeBlanc,* 228 Mich. 74; *Bolthuis* v. *Bolthuis,* 233 Mich. 584; *Hammond* v. *Hammond,* 234 Mich. 444; *Metcalf* v. *Metcalf,* 235 Mich. 389.

Considerable of defendant's testimony as to his wife's whereabouts was based upon what had been

told to him. The record shows that the man with whom she is claimed to have been seen on the street under questionable circumstances was married to another woman shortly after the parties to this proceeding were separated. We conclude that upon the record before us neither party has established a cause for divorce.

It is not usual for the custody of children so young as those in this litigation to be taken from the mother upon so slight a showing as this record discloses. *Prima facie* she is entitled to their custody. 3 Comp. Laws 1915, § 11484.

"Besides, the children are of very tender age, and the statute favors the custody of the mother under such circumstances." *Klein* v. *Klein,* 47 Mich. 518.

The record fails to disclose that the prosecuting attorney was served with notice or appeared in behalf of the minor children as the statute requires should be done. 3 Comp. Laws 1915, § 11433.

The equity of the parties in their home, amounting to somewhere near $800 when this bill was filed, was made up of $400 contributed by the father of the plaintiff as a wedding present to her, as she testified, and subsequent payments upon their contract to which she contributed to some extent. Inasmuch as no decree of divorce is granted their title by entireties to this equity must remain undisturbed. *Bowen* v. *Bowen, supra.*

The decree is reversed, and one may be entered here in accordance with this opinion, dismissing both bill and cross-bill, with costs of this court to appellant.

SHARPE, C. J., and BIRD, SNOW, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.